**STATE of Missouri, Respondent,**

v.

**Victor A. EDWARDS, Appellant.**

**No. WD 73050.**

Missouri Court of Appeals,
Western District.

March 13, 2012.

Motion for Rehearing and/or Transfer to
Supreme Court Denied May 1, 2012.

Janet Thompson, Columbia, MO, for Appellant.

Jayne Woods, Jefferson City, MO, for Respondent.

Before JAMES M. SMART, JR., P.J., VICTOR C. HOWARD, and JAMES EDWARD WELSH, JJ.

JAMES EDWARD WELSH, Judge.

Victor A. Edwards appeals the circuit court's judgment convicting him of one count of first-degree statutory sodomy after a trial by jury. He asserts four points on appeal. First, he contends that the circuit court erred in instructing the jury by failing to identify, in the verdict director, the specific act of sodomy the jury was to consider. Second, he claims that the evidence was insufficient to warrant conviction and, therefore, the court erred in failing to grant his motion for acquittal. Third, he contends that he was prejudiced by the State's closing statements and challenges the court's failure to *sua sponte* declare a mistrial. Finally, he claims that he was prejudiced by State testimony that improperly vouched for the victim's credibility and alleges error in the court's failure to *sua sponte* declare a mistrial. We affirm the circuit court's judgment.

Viewed in the light most favorable to the verdict, the evidence established that during the summer of 2009, four-year-old B.E. resided in the home of paternal grandparents, Victor and Cindy Edwards. Cindy Edwards and Alan Edwards, B.E.'s father, shared joint legal custody of the child.[1] B.E.'s mother, Jessica Edwards, had visitation rights on alternate weekends.

Between July 24, 2009, and July 27, 2009, and during a weekend visitation B.E. had with her mother, B.E. reported that "Grandpa Victor had touched her butt with his popsicle" and that he had also put "it" in her mouth. Upon B.E.'s description of the "popsicle" as coming from her grandfather's pants and being the color of skin, B.E.'s mother consulted a hospital and reported B.E.'s statements to the Division of Family Services.

On July 28, 2009, B.E. was interviewed by Children's Services Investigator Vicki Sweet. Sweet testified at trial that B.E. disclosed that her grandfather "put the popsicle in her butt and that it hurt" and "put the popsicle in her mouth and that she had it in her mouth until pee juice came out." Sweet testified that to demonstrate what B.E. meant by "popsicle," B.E. drew a picture of her grandfather's body, drew a picture of the "popsicle," and discussed that the "popsicle" stuck out of his body. B.E. identified the "popsicle" as having a hat with a hole in it. The child drew wavy lines on the "popsicle" and indicated that they were purple, crooked lines. Sweet testified that, during her interview, B.E. stated that the aforementioned contact occurred in the grandfather's bedroom.

On July 30, 2009, a videotaped interview of B.E. was conducted by Verna Kelsey of the North Central Missouri Children's Advocacy Center. During this interview, B.E. told Kelsey that "Grandpa Edward" touched her on the "butt" with his "popsicle" and that he put the "popsicle" "inside" her "butt." When describing what it felt like, B.E. said "Ow." During the interview, Kelsey asked B.E. to show her, on an anatomical female child doll, where her grandfather put his "popsicle." B.E. voluntarily removed the doll's clothing and pointed to and touched what appeared to be the anal area of the doll. Kelsey requested that B.E. demonstrate the grandfather's acts with the dolls, and B.E. voluntarily removed the boy doll's clothing, turned the girl doll over so that her back was facing the boy doll, and positioned the

1. Alan Edwards also resided, with B.E., in the home of Victor and Cindy Edwards.

dolls so that the boy doll's penis appeared to be entering the girl doll's anal area. While demonstrating, B.E. said "Ow." Kelsey asked, "Does that hurt?" to which B.E. replied, "Uh huh." Kelsey asked, "Do you cry?" B.E. again put the boy doll's penis to the girl doll's anal area, made a squeaking noise, and again said, "Ow." Without prompting, B.E. then turned the dolls to face each other and voiced a conversation between the dolls. B.E., as the voice of the girl doll, said, "Boy, why did you do— stop doing that with your popsicle." One of the dolls then said "I love you," and the other responded, "I love you too." B.E. then spontaneously put the naked boy doll in a sitting position and sat the naked girl doll, with the girl doll's back against the boy doll's chest, upon the boy doll's penis. While holding the dolls in that position, B.E. said, "Wait for it . . . wait for it," and then pulled the dolls apart.

Kelsey asked B.E. "where else" B.E.'s grandfather put his "popsicle." B.E. then appeared to place the girl doll's hand on the boy doll's penis. Kelsey was unable to elicit from B.E. specifics with regard to where the acts occurred, other than B.E. stating that she was "in a room," at "Grandma's house," and at "my house."[2] Kelsey asked, "When Grandpa Edward put his popsicle in your butt, was than one time or more than one time?" B.E. replied, "Two." After questioning B.E. as to whether anything came out of "Grandpa's popsicle," Kelsey asked, "When something comes out of the popsicle, where does it go?" B.E. responded, "It goes in my throat." Kelsey asked, "How does it go in your throat?" B.E. replied, "I swallow it" and stated that it tastes like, "Ew." Kelsey

asked B.E. to demonstrate with the dolls how the "stuff that comes out of the popsicle" got in B.E.'s throat. B.E. said, "Get the popsicle out" and put the boy doll's penis in her own mouth. B.E. also stated, "I suck it, I bite it."

Victor Edwards was charged with first degree statutory sodomy, and, one year after B.E.'s initial disclosure, B.E. testified at Edwards's jury trial. During that testimony, B.E. stated that her "grandpa" whom she called "Victor" touched her on her "pee pee," "mouth," and "butt" with his "popsicle" and that it occurred at her grandmother's house. She stated that it happened "only one time." When B.E. was asked to recollect her conversation with Children's Services Investigator Sweet from the previous year, B.E. denied telling Sweet that anything happened in her grandfather's bedroom but indicated that "he put his popsicle in my mouth twice . . . in the bathroom."

Victor Edwards testified at trial. Edwards denied sodomizing B.E. and claimed that B.E.'s mother fabricated the sodomy allegations in retaliation for being refused visitation. Edwards reported that B.E.'s mother was not allowed to pick B.E. up until several hours after the start of her regularly scheduled visitation because B.E. was attending Vacation Bible School. Consequently, B.E.'s mother requested an additional day of visitation that was refused by Edwards's wife. Edwards testified that he could not "be left alone with any of those kids" because of illness and sleep inducing medication.

Edwards's wife, Cindy Edwards, testified that a babysitter stayed with B.E.

---

2. In response to Kelsey's inquiries regarding "what room" at B.E.'s home the acts occurred, B.E.'s answer suggests that she was asked to generally name the rooms in her home as she answers, "I got my play pen, my daddy's room . . ." and moves on to inform Kelsey that she cannot put the doll's shoes back on. B.E. ignores Kelsey's specific question as to whether the acts occur "in your room at your house or are you in a different room like a kitchen or bathroom or something else?"

until B.E.'s father arrived home from work each day. Because Victor Edwards arrived home before B.E.'s father, Cindy Edwards testified that she could have left Victor in charge of B.E. but did not because she "felt that it would be best if there was a woman in the house with a child."

Barbara Tunnell, B.E.'s babysitter, also testified. Tunnell indicated that B.E. had some mobility difficulties due to cerebral palsy but that she could crawl and was learning to get around fairly well with a walker. She indicated that baby gates prevented B.E. and household dogs from entering Edwards's bedroom. Tunnell testified that she remained at the home until B.E.'s father, Alan Edwards, arrived home. She stated that this was because Victor Edwards had chores to do and would "come in and go lay down" upon taking medication that made him sleepy.

At the close of the evidence, the jury found Edwards guilty of first-degree statutory sodomy. The court sentenced Edwards to a thirty-year prison term, and Edwards appeals.

In his first point on appeal, Edwards contends that the court erred in submitting a verdict director that did not identify the specific incident of sodomy that the jury was required to agree he committed, thereby violating his right to due process, a fair trial, a unanimous verdict, and freedom from double jeopardy. Edwards concedes failing to properly preserve this issue for appeal and, therefore, requests plain error review per Rule 30.20.

■ Rule 30.20 authorizes this Court to review, in its discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted there from." Our Supreme Court has established a threshold review to determine if a court should exercise its discretion to en-

tertain a Rule 30.20 review of a claimed plain error. First, we determine whether or not the claimed error "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted[.]'" *State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995) (quoting Rule 30.20). If not, we should not exercise our discretion to conduct a Rule 30.20 plain·error review. If, however, we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20. In the first step, we decide whether plain error has, in fact, occurred. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc), cert. denied, —— U.S. ——, 130 S.Ct. 144, 175 L.Ed.2d 93 (2009). "All prejudicial error, however, is not plain error, and plain errors are those which are evident, obvious and clear." *Id.* (citations and internal quotation marks omitted). In the absence of evident, obvious, and clear error, we should not proceed further with our plain error review. If, however, we find plain error, we must continue to the second step to consider whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected. *Id.* Here, Edwards claims instructional error. For instructional error to constitute plain error, Edwards must show that the court "so misdirected or failed to instruct the jury that the error affected the jury's verdict." *State v. Celis–Garcia*, 344 S.W.3d 150, 154 (Mo. banc 2011) (citations omitted).

In the present case, the circuit court submitted Instruction No. 5, which read as follows:

If you find and believe from the evidence beyond a reasonable doubt:

First, that between the dates of May 20th through July 23, 2009, in the

County of Sullivan, State of Missouri, the defendant knowingly touched the anus of B.E. with his penis and inserted his penis into the anus of B.E., and

Second, that such conduct constituted deviate sexual intercourse, and

Third, that at the time B.E. was less than twelve years old.

Then you will find the defendant guilty of Statutory Sodomy in the first degree under this instruction.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense under this instruction. As used in this instruction, the term "deviate sexual intercourse" means any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person.

Edwards argues that, because the State presented evidence of multiple acts of sodomy and the verdict director failed to identify the specific act of sodomy the jury was to consider for their verdict, there was no assurance that the jury unanimously convicted on the same act. Therefore, he contends that his right under the Missouri Constitution to a unanimous jury verdict was violated. Mo. Const. art. I, sec. 22(a); *State v. Jackson*, 242 Mo. 410, 146 S.W. 1166, 1169 (1912). Edwards relies on *State v. Celis–Garcia* which held that a defendant's right to a unanimous verdict is

protected in a multiple acts case by either the state (1) electing the particular criminal act on which it will rely to support the charge or (2) the verdict director specifically describing the separate criminal acts presented to the jury

and the jury being instructed that it must agree unanimously that at least one of those acts occurred.

344 S.W.3d at 157 (footnote omitted). Edwards contends that, pursuant to the holdings in *Celis–Garcia* as well as *State v. Pope*, 733 S.W.2d 811 (Mo.App.1987), the court erred. We disagree.

In *Celis–Garcia*, the defendant was alleged to have participated, with her boyfriend, in sodomizing her two minor daughters, ages five and seven. 344 S.W.3d at 152. Trial evidence revealed "at least seven separate acts of statutory sodomy that occurred at different times (some more than three days apart) and in different locations." *Id.* at 156. All of the separate acts of sodomy involved Celis–Garcia placing her hands on the genitals of the children. *Id.* at 153. To convict Celis–Garcia on one count of sodomy for each child, the verdict director asked the jury to find that Celis–Garcia had placed her hand on each child's genitals. *Id.* at 154. Our Missouri Supreme Court concluded that "[d]espite evidence of multiple, separate incidents of statutory sodomy, the verdict directors failed to differentiate between the various acts in a way that ensured the jury unanimously convicted Ms. Celis–Garcia of the same act or acts." *Id.* at 156. The court expressed that "[b]ecause it is impossible to determine whether the jury unanimously agreed on any one of these separate incidents, the verdict directors violated Ms. Celis–Garcia's constitutional right to a unanimous jury verdict under article I, section 22(a) of the Missouri Constitution." *Id.* at 158.

Like *Celis–Garcia*, *State v. Pope* involved two child victims. The defendant was charged with sodomy for the specific acts of placing his penis into one child's mouth and forcing the other child to masturbate him. *Pope*, 733 S.W.2d at 812. The evidence showed that, for one child,

the defendant had both placed his penis in the child's mouth and forced the child to "masturbate" him. *Id.* The other victim had been forced to masturbate the defendant, and the defendant had also placed his finger in the child's vagina. *Id.* The verdict directors merely instructed the jury to find the defendant guilty of sodomy if he had engaged in "deviate sexual intercourse" and defined deviate sexual intercourse as "any sexual act involving the genitals of one person and the mouth, tongue, hand or anus of another person." *Id.* The court concluded that "[n]owhere in the record was the jury ever informed of the specific act defendant was charged with" and determined that, when the State specified an act of sodomy in its charge, "the State was held to proof of that act and the jury can convict only on that act." *Id.* at 812–813 (citations omitted). The court held that, although the defendant was charged with a specific act of sodomy, the evidence consisted of additional acts of sodomy for which the defendant was not charged. *Id.* Because the jury, under the general verdict director, could have convicted the defendant on an act of deviate sexual intercourse for which the defendant was not charged, this court reversed. *Id.*

Edwards contends that the facts of his case "are akin to those in both *Celis–Garcia* and *State v. Pope.*" We disagree. *Pope* is inapplicable because the defendant was charged with a specific act of sodomy but convicted on a general verdict director that failed to specify the charged act. *Id.* Here, Edwards was charged generally with statutory sodomy but was convicted on the specific act, per the verdict director, of touching and penetrating B.E.'s anus with his penis. Thus, because of the specificity in the verdict director, this case is not akin to *Pope.* While the issue in *Celis–Garcia* is more applicable to Edwards's argument, *Celis–Garcia* is distinguishable.

Edwards correctly identifies his case as one with "multiple acts." At trial there was evidence of multiple, distinct criminal acts of sodomy, each of which could have served as the basis for a criminal charge. *Celis–Garcia,* 344 S.W.3d at 155–156. B.E. testified that Edwards "touched" her on her "pee pee," "mouth," and "butt." She testified that "he put his popsicle in my mouth twice ... in the bathroom." Each allegation of vaginal, oral, and anal contact constituted deviate sexual intercourse, and, therefore, each could have served as a basis for the criminal charge of sodomy. However, Edwards was charged with only one count of sodomy for "deviate sexual intercourse" involving anal contact.

██ To avoid violating a defendant's right to a unanimous jury verdict in a multiple acts case, the State is required to either elect "the particular criminal act on which it will rely to support the charge" or the verdict director must specifically describe the "separate criminal acts presented to the jury," with the jury being instructed that it must unanimously agree that at least one of those acts occurred. *Id.* at 157. Here, the State chose to elect a particular criminal act to support the charge of deviate sexual intercourse—that Edwards "knowingly touched the anus of B.E. with his penis and inserted his penis into the anus of B.E." Thus, this specificity in the verdict director prevented the jury from finding Edwards guilty of any sodomy not involving penile to anal contact. Therefore, Edwards's charge that "the state presented evidence of several acts of penis to anus and penis to mouth contacts ... yet the verdict director did not specify any one of these incidents, thereby making it unclear as to of which incident Mr. Edwards was found guilty" is disingenuous. The verdict director very clearly excluded all deviate sexual contact but penile to anal.

Consequently, our focus becomes whether the evidence reflects multiple, distinct acts of penile to anal contact, such that would warrant more specificity in the verdict director to insure jury unanimity. To determine if such multiple acts exist, we consider the following factors: " '(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.' " *Id.* at 156 (quoting 75B AM.JUR. 2D Trial § 1511). In applying these factors to the evidence, we find no multiple, distinct acts of penile to anal contact.

After B.E. testified that Edwards had touched her with his "popsicle," counsel inquired as to where Edwards's "popsicle" touched her. B.E. replied, "At my pee pee and my mouth and in my butt." Counsel then asked, "Okay. So more than one time?" B.E. responded: "Only one time." At trial, while B.E. testified on cross-examination that "he put his popsicle in my mouth twice" and that it happened "in the bathroom," B.E. never contradicted her testimony that penile to anal contact happened "only one time." The State also introduced Verna Kelsey's videotaped interview of B.E. that was made contemporaneous with B.E.'s initial disclosure of the allegations. In the interview, B.E. was asked: "When Grandpa Edward put his popsicle in your butt was that one time or more than one time?" B.E. answered: "Two." While "two" may at first blush suggest "multiple acts," when applying the requisite factors for a "multiple acts" determination, we cannot conclude that there were "multiple acts" of penile to anal con-

tact. No evidence suggests that, when Edwards put his penis in B.E.'s anus "two" times, this did not occur at or near the same time, at the same location, with no intervening events or fresh impulses of motivation. In fact, B.E. demonstrated what occurred when interviewed by Verna Kelsey, and described through the use of dolls that Edwards first entered her anus from behind, soothed B.E. when she exclaimed in pain, then immediately sat B.E. on his lap in a backward seated position and again inserted his penis into her anus. The evidence could certainly explain B.E.'s answer of "two." However, this evidence hardly qualifies as multiple, distinct acts applying the factors we are to consider.[3]

Edwards additionally argues that the State's evidence of "contacts" occurring in multiple locations also suggests lack of jury unanimity for the same act of sodomy. We disagree. That "contacts" occurred in multiple locations is uncontested. However, because the verdict director is specific with regard to penile to anal contact, we need only concern ourselves with whether penile to anal contact occurred in more than one location, which might be indicative of "multiple acts." We find no such evidence. While the child testified at trial that penile to oral contact occurred in the bathroom, B.E. did not specify where the anal contact occurred. In B.E.'s videotaped interview, she was not specific as to a particular room in her grandparent's house that penile to anal contact occurred. Children's Services Worker Sweet was asked on cross-examination if B.E. reported "where *it* happened." Sweet stated that B.E. said "*it* happened" in "Grandpa's bedroom." In later testimony Sweet stated that "later there was more disclosure in different areas of the

---

**3.** Had the State charged Edwards with two counts of anal sodomy based only on this evidence, Edwards might then have been in danger of double jeopardy for lack of evidence of more than one separate act.

home, and *it* wasn't a one-time incident." Sweet had previously testified to B.E.'s disclosure of both oral and anal contact, so Sweet's later references to "it" cannot be deemed to reference only anal contact. We cannot reasonably conclude that Sweet's testimony establishes that penile to anal contact occurred in multiple locations.

We, therefore, conclude that the court did not err in instructing Edwards's jury. The evidence reflects multiple acts of deviate sexual intercourse, each of which could have served as the basis for a criminal charge. The evidence does not, however, reflect multiple, distinct acts of penile to anal contact. Edwards was charged with a single count of deviate sexual intercourse. In the verdict director, the State elected to rely on the particular criminal act of penile to anal contact to support the charge. Because there was no evidence of multiple acts of penile to anal contact, further instruction regarding unanimity on specific acts was unnecessary.[4] We conclude that Edwards's claim does not facially establish substantial grounds for believing that he is a victim of manifest injustice, and we, therefore, decline a full plain error review. Point one is denied.

In his second point on appeal, Edwards contends that the court erred in failing to grant his motion for acquittal at the close of evidence and contends that the evidence was insufficient for a reasonable jury to have found him guilty. To support his claim, Edwards asserts that the sodomy allegations first came about after B.E.'s mother was denied extended visitation by Edwards's wife, suggesting that the allegations were fabricated. He also contends that B.E. only used the word "popsicle" to refer to Edwards's penis after a forensic interviewer proposed the word. Additionally, Edwards points to B.E.'s failure to identify him in the courtroom and suggests the impossibility of his having committed the offenses due to his own lack of access to the child. We find the evidence sufficient.

■ In reviewing the sufficiency of the evidence, we accept as true all evidence favorable to the State, and "[a]ll evidence and inferences to the contrary are disregarded." *State v. Crawford,* 68 S.W.3d 406, 407–408 (Mo. banc 2002). Our review is "limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *Id.* at 408.

The jury found Edwards guilty of first-degree statutory sodomy. A first-degree statutory sodomy conviction requires proof beyond a reasonable doubt that the defendant engaged in deviate sexual intercourse with a person less than fourteen years of age. § 566.062, RSMo Cum.Supp.2011. "Deviate sexual intercourse" is defined as

> any act involving the genitals of one person and the hand, mouth, tongue, or anus of another person or a sexual act involving the penetration, however

4. We are mindful that Paragraph first of the verdict director submitted both the act of touching B.E.'s anus with Edwards's penis and the act of penetrating B.E.'s anus with Edwards's penis. That does not require us to summarily conclude that the evidence supports Edwards's claim that multiple, distinct acts of penile to anal contact were established by the evidence. Though the act of "touching" and of "insertion" could, if otherwise qualified as multiple, distinct acts, support separate charges and submissions in a verdict director, here, the evidence supports only the conclusion that "touching" and "insertion" occurred in connection with a single chargeable incident. If anything, the verdict director increased the State's burden by requiring the jury to find that both touching and insertion occurred during the single incident of penile to anal contact described in the evidence, where touching alone would have been sufficient to convict Edwards.

slight, of the male or female sex organ or the anus by a finger, instrument or object done for the purpose of arousing or gratifying the sexual desire of any person or for the purpose of terrorizing the victim.

§ 566.010(1), RSMo Cum.Supp.2011. Here, per the jury's verdict director, the jury was limited to determining whether Edwards engaged in deviate sexual intercourse in the form of penile to anal contact with B.E.[5]

■ We first note that there is no merit to Edwards's contention that B.E. first used the word "popsicle" after a forensic interviewer proposed the word. We have reviewed the evidence. Approximately ten minutes into B.E.'s interview B.E. identifies the penis on an anatomical drawing of a boy as a "pee pee." As the interview progresses B.E. divulges that she was "touched" by her "Grandpa Edward." Approximately seventeen minutes into the interview, B.E. is asked to show the interviewer, on the anatomical drawing, what her grandfather touched her with. B.E. verbally responds, "With his popsicle" but does not reference the drawing. The interviewer then asks B.E. if she sees a "popsicle" on the drawing. B.E. then takes the drawing and responds, "On the pee pee." The interviewer asks B.E. if she sometimes calls the "pee pee" a "popsicle," to which B.E. replies, "Uh huh." Edwards's claim that the interviewer first suggested the word "popsicle" is disingenuous.

■ Edwards's additional claims of evidentiary insufficiency all fall within the jury's province to weigh the evidence and resolve evidentiary conflicts. *State v. Londagin,* 102 S.W.3d 46, 52 (Mo.App.2003).

"The reliability and credibility of a witness is for the jury to decide." *State v. Sumowski,* 794 S.W.2d 643, 645 (Mo. banc 1990). "Testimony of a single witness may be sufficient to constitute substantial evidence to make a submissible case." *Id.* "It is within the jury's province to believe all, some, or none of the witness's testimony in arriving at their verdict." *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). "This court's review ... is limited to determining whether there was substantial evidence that, if believed by [the] jury, would sustain a guilty verdict." *Londagin,* 102 S.W.3d at 52.

The jury heard Edwards testify that B.E.'s mother fabricated the allegations of sodomy but also heard B.E. testify that her mother had not proposed those allegations to her. While Edwards testified that he was never alone with the child, the jury heard evidence from Edwards's own witness that Edwards would sometimes "come in and go lay down" while the babysitter was still at the residence. The babysitter testified that she left the home once B.E.'s father arrived and had no knowledge of what transpired in the home after her departure. The jury witnessed B.E.'s inability to identify Edwards in the courtroom. However, the jury also heard the five-year-old testify, one year after she first reported Edwards's behavior, that her "grandpa" touched her with his "popsicle" and that she also called this grandfather "Victor" and "Grandpa Edwards."

■ B.E.'s inability to identify or recognize Edwards in the courtroom does not establish evidentiary insufficiency. We find that other cumulative evidence at trial sufficiently established that Edwards was the man who sodomized B.E. *See State v. Lawrence,* 64 S.W.3d 346, 355 (Mo.App.

---

5. Specifically, that Edwards "knowingly touched the anus of B.E. with his penis and inserted his penis into the anus of B.E."

2002). In-court identification is not always required. *State v. Simmons,* 760 S.W.2d 521, 523 (Mo.App.1988) "[T]he inability of an eyewitness to identify the defendant in court [is] not dispositive of the question of the sufficiency of the evidence that the defendant was the perpetrator of the crime." *Id.* at 524. We must only determine whether, "from all the evidence, the jury could have drawn a reasonable inference that the defendant was the perpetrator of the crime." *Id.* Here, we find the evidence sufficient for that inference and sufficient for the jury to conclude beyond a reasonable doubt that Edwards was guilty of first-degree statutory sodomy. Point two is denied.

In his third point on appeal, Edwards contends that the court erred in failing to *sua sponte* instruct the jury to disregard and declare a mistrial when the State told the jury to "do the right thing" and that the jurors were the adults to whom B.E. reported the abuse. Edwards maintains that these arguments personalized the case to the jury and incited the passions and prejudices of the jury such that their decision was not based on the facts and the law. He contends that the improper argument, coupled with "gossamer-thin evidence, likely tipped the balance toward conviction" and resulted in manifest injustice.

■■■ Edwards admits failing to preserve this claim and requests review for plain error. "[A]lleged errors committed in closing argument do not justify relief under the plain error rule unless they are determined to have a decisive effect on the jury." *State v. Sidebottom,* 753 S.W.2d 915, 920 (Mo. banc 1988). "A prosecutor's statement has a decisive effect if there is a 'reasonable probability that the verdict would have been different had the error not been committed.'" *State v. White,* 247 S.W.3d 557, 563 (Mo.App.2007) (citations

omitted). "Trial judges are not expected to assist counsel in trying cases, and trial judges should act *sua sponte* only in exceptional circumstances." *Id.* "Because trial strategy looms as an important consideration in any trial, assertions of plain error concerning matters contained in closing argument are generally denied without explication." *Id.* We, therefore, make our explication brief.

■■■ Edwards's counsel, in closing arguments to the jury, referenced Instruction No. 6 and stated: "You took an oath to do what you thought was right, and if you have a reasonable doubt, the instruction says that you must find him not guilty." In response to this statement, the State stated:

> But the reasonable doubt, firmly convinced—I mean read the instructions. I don't care. She wants you to read them, read them. I want you to. If you are firmly convinced from the evidence that you saw today, that that man raped that little girl, then do the right thing, and let's convict him.

We cannot conclude that the State's adaptation of Edwards's counsel's reminder to the jury of their oath to do what "was right" into "do the right thing" had any effect on the jury, much less a decisive one.

■■■ Similarly, Edwards's claim of manifest injustice due to the State's explanation to the jury that children are instructed to tell an adult if someone touches them and that the jurors were "the adults that she told, and I'm asking you to do something about it for her" is without merit. There was sufficient evidence for the jury to find Edwards guilty without these comments, and he fails to prove "a reasonable probability that the verdict would have been different absent these remarks." *Id.* at 564. We disagree that the evidence

was so "gossamer-thin" that the aforementioned comment by the State tipped the balance toward conviction. We conclude that Edwards's claims of prejudicial prosecutorial closing arguments do not facially establish substantial grounds for believing that he has been a victim of manifest injustice, and we, therefore, decline a full plain error review. Point three is denied.

In his fourth point on appeal, Edwards claims that an investigator's expert testimony improperly vouched for B.E.'s credibility and that the court erred in failing to *sua sponte* declare a mistrial. He contends that Vicky Sweet's testimony, that she "believed" B.E. and that B.E. had "a lot more information than what a child their age would have regarding a sexual issue," warranted a *sua sponte* mistrial. Edwards admits failing to object to Sweet's testimony at trial and requests plain error review. The following is the challenged testimony:

Prosecutor: As part of your investigation with B.E., you finish— or was there more to the interview?

Sweet: No. We only do as much of an interview as we need to, and then we send them to a child advocacy center.

Prosecutor: So at some point there's a finding on your part, which is part of the process, that she needs to go to the Children's Advocacy Center?

Sweet: Yes, I believed her, so I wanted her to go on.

Prosecutor: At what point do you make that decision? Once you've—how is that determination made?

Sweet: Well, I determine it by when I'm discussing it with the child,

when it comes to a point that they've got a lot more information than what a child their age would have regarding a sexual issue or when they keep making consistent statements or it— when she discussed that there was pee juice that came out of his popsicle and described the popsicle and the hat and the hole. I wanted her to go get a child advocacy interview because it's videotaped.

■ First, we disagree with Edwards's contention that, while no foundation was laid to establish Sweet as an expert witness, the State intended Sweet as an expert witness. The record suggests otherwise. In a section 491.075 [6] hearing, the State indicated that the purpose of Sweet's testimony would be to offer into evidence statements that B.E. made to Sweet during an interview. At trial, as conceded by Edwards, Sweet was not presented as an expert witness and was merely asked her name, place of employment, and the capacity in which she was employed. The State's examination of Sweet at trial focused on B.E.'s interview responses to Sweet and Sweet's decision to conclude the interview.

■ "To lay a proper foundation for the testimony of an expert witness, the proponent must show that the witness has sufficient expertise and acquaintance with the incident involved to testify as an expert." *State v. Watling*, 211 S.W.3d 202, 208 (Mo.App.2007). "[A] witness is not considered an 'expert' witness unless and until a proper foundation has been laid as to his qualifications." *State v. Hoy*, 219 S.W.3d 796, 799 n. 2 (Mo.App.2007). Here, a foundation was never laid for expert testimony by Sweet, and she was, therefore, not an

**6.** RSMo Cum.Supp. (2011).

"expert" witness. The distinction between expert and lay witnesses is significant because it helps govern our scrutiny of permissible and impermissible testimony.

▇▇▇ Here, Sweet's testimony that she "believed" B.E. was not so much an opinion regarding B.E.'s credibility, as it was an explanation for her decision to terminate the interview. Sweet's testimony was helpful to a clear understanding of Sweet's determination to end her own interview and refer B.E. for a videotaped interview at a child advocacy center. The jury ultimately viewed that videotaped interview and had the opportunity to personally assess B.E.'s believability. Thus, we cannot conclude that Sweet's comments usurped the decision-making function of the jury.

All of the expert testimony cases cited by Edwards reference the testimony of doctors. *See State v. Churchill*, 98 S.W.3d 536, 539 (Mo. banc 2003), *State v. Middleton*, 998 S.W.2d 520, 526 (Mo. banc 1999), *State v. Williams*, 858 S.W.2d 796, 798 (Mo.App.1993), *State v. Taylor*, 663 S.W.2d 235, 236 (Mo. banc 1984). The lay testimony cases cited by Edwards reference the testimony of a wife and the testimony of a sheriff who took a statement from an alleged rape victim. *See State v. Burgett*, 848 S.W.2d 613, 616 (Mo.App.1993) and *State v. Dixon*, 70 S.W.3d 540, 548 (Mo. App.2002). Edwards's case is most akin to the sheriff's testimony in *Dixon*. In *Dixon*, the court found that "even if [the sheriff's] challenged testimony improperly stated an opinion as to the veracity of [the child's] allegations against [the defendant], [the defendant was] not entitled" to plain error relief because there was no manifest injustice. 70 S.W.3d at 549. The court noted that the State did not refer to the sheriff's testimony again in subsequent questioning or closing argument, that independent evidence of the defendant's guilt was strong, and that the child's testimony was consistent with the statement given to the sheriff. *Id.* Likewise, here the State never again referred to Sweet's testimony in subsequent questioning or in closing argument, and independent evidence of Edwards's guilt, in the form of B.E.'s consistent personal testimony, was strong.

▇▇▇ Nevertheless, even if Sweet were deemed an expert, her testimony would not warrant relief for plain error. In cases involving the sexual abuse of a child, there are typically two types of expert testimony that give rise to a challenge: general and particularized. General testimony describes a 'generalization' of behaviors and other characteristics commonly found in those who have been the victims of sexual abuse. Particularized testimony is that testimony concerning a specific victim's credibility as to whether they have been abused. The trial court has broad discretion in admitting general testimony, but when particularized testimony is offered, it must be rejected because it usurps the decision-making function of the jury and, therefore, is inadmissible. *Churchill*, 98 S.W.3d at 539 (footnotes omitted). As stated, Sweet's testimony was an explanation for the termination of her interview with B.E. and, therefore, was more general than particular. The testimony was brief, unsolicited, and not referenced in argument. *See State v. Artis*, 215 S.W.3d 327, 340 (Mo.App.2007). "Unsolicited statements that are brief and limited in substance do not amount to reversible error in the absence of evidence that the prosecutor intentionally tried to inject unfair prejudice into the trial." *State v. Johnston*, 957 S.W.2d 734, 749 (Mo. banc 1997). We find no such evidence here. Because Edwards did not object to these statements at trial, the issue before us is "whether or not this was such an evident, obvious, and clear error that the trial court

should have *sua sponte* interrupted [Sweet's] testimony to prohibit [her] from testifying that [she] believed the victim." *State v. D.W.N.*, 290 S.W.3d 814, 819 (Mo. App.2009). "Historically, Missouri courts reject invitations to criticize trial courts for declining to *sua sponte* take action on behalf of a party during witness examinations." *Id.* Such uninvited interference attracts trial error and could potentially transform the jury's perception of the judge from unbiased governor to party advocate. *Id.* We do not find Sweet's testimony an "exceptional circumstance" of evident, obvious, or clear error such as would warrant *sua sponte* judicial interference. Consequently, we conclude that Edwards's claim does not facially establish substantial grounds for believing that he has been a victim of manifest injustice, and we, therefore, decline a full plain error review. Point four is denied.

We, therefore, conclude that the circuit court did not err in instructing the jury because there was no evidence of multiple, distinct acts of penile to anal contact, and, therefore, the verdict director was sufficiently specific. Further, the court did not err in failing to acquit Edwards at the close of evidence because the evidence was sufficient for a jury to find Edwards guilty, beyond a reasonable doubt, of first-degree statutory sodomy. In addition, the court did not err in failing to *sua sponte* declare a mistrial for the State's closing arguments. The evidence was sufficient for the jury to find Edwards guilty without these comments, and we find no reasonable probability that the verdict would have been different absent the remarks or that the comments had a decisive effect on the jury. Finally, the court did not err in failing to *sua sponte* declare a mistrial for testimony that Edwards claimed improperly vouched for B.E.'s credibility. The challenged testimony was rationally based on the witness's perception of statements

made to her, was helpful to a clear understanding of the witness's testimony, and, in light of the jury's ability to personally assess the victim's credibility, was not prejudicial such that it spawned manifest injustice. We affirm the circuit court's judgment.

All concur.